**STATE of Missouri, Respondent,**

v.

**Richard Lee FIELDS, Appellant.**

No. 48970.

Supreme Court of Missouri,

Division No. 2.

April 8, 1963.

R. B. Kirwan, Kansas City, for appellant.

Thomas F. Eagleton, Atty. Gen., O. Hampton Stevens, Special Asst. Atty. Gen., Jefferson City, for respondent.

LEEDY, Judge.

Richard Lee Fields was convicted and sentenced to imprisonment for a term of three years for the felony of attempting to obtain money by trick, false and fraudulent representations, statements and pretenses by means and use of "the confidence game." See Section 561.450, RSMo 1959 and V.A.M.S. (to which revision all references to statutes apply, unless otherwise expressly noted).

■ The transcript on appeal is irregular and confusing. In the first place, it should not have included (as it does, *and this at public expense)* a copy of the Magistrate's transcript which sets out such matters (wholly immaterial and irrelevant to any issue even sought to be presented on this appeal) as the original complaint, the warrant for the arrest of appellant and the return of the arresting officer thereon, the "commitment for trial" and "Summary of Costs in Magistrate Court." Conversely, a copy of the information was not included in the transcript filed here, but on the state's motion that deficiency (and another) was corrected by supplemental transcript. The latter shows that Clarence Rufus Putnam and James David Marsh were joined with Fields as co-defendants, so that all three were jointly charged with the commission of the offense. The trial about to be reviewed was probably a joint trial of all such defendants, but that fact does not appear from the transcript beyond peradventure. There are recitals (and omissions) in the record from which a contrary inference might easily be drawn. If it was a joint trial, the resulting disposition of the case as to Putnam and Marsh is not shown, but this is of no consequence since Fields alone prosecutes this appeal.

■ Defendant was represented by counsel in the circuit court, and in the absence of a brief on his part we look to his motion for a new trial for his assignments of error, and consider such of them as are sufficient under Rule 27.20(a) to present anything for appellate review, and disregard (without comment) those palpably insufficient. Among others is a challenge of the sufficiency of the evidence to support the verdict, and for this reason we state the facts in some detail. The state's evidence tended substantially to show the following state of facts:

On the morning of Friday, January 13, 1961, Fields made an unsolicited appearance at the door of the Peters home at 3510 Gladstone Boulevard in Kansas City. He was accompanied by Putnam and Marsh. Fields informed Mrs. Edith Lowe Peters (79 years of age) that they were inspecting for termites, and wanted to check the house. She told him "we had had that taken care of" (five or six years previously), but she

didn't know what company it was. He replied that "they would check and if they had a contract they would come back." He returned the next morning and "said they had had the contract, they would like to check and see how things were, the conditions were, to see if there were any termites. They would take care of it because they had the contract." Upon this representation (which was false) she admitted and accompanied them to the basement so they could check and examine it for termites. After having done so (or having pretended to do so), "they said the termites were in the corner of the garage" (which was connected with the house), and stating further, "We will take care of that because we have a contract on it." One of the men (whom we understand was Fields), after going around the basement "almost to the door coming out," and pretending to make the discovery, stated to her, "Oh, there are beetles. You have beetles, they ought to be taken care of. I can't use the termite spray on that, but it won't be expensive. It is only $12.50 a pound. I will give you a five-year contract on it." After displaying to Mrs. Peters what he represented to be termites which he had found, and after pointing out what he claimed to be beetle damage, Fields "wanted to back his car (equipped with a fogging machine and air compressor) right into the garage," so he could have his tools to go ahead with the spray. Mrs. Peters then told him, "All right" (but reproving herself on the witness stand for not having asked how much the cost would be). She stayed downstairs for a few minutes, but the odor became "pretty bad," and she went on upstairs, saying "When you get through, I presume you will send me a statement. I will mail you a check." He replied, "Oh, no, we want the cash when we get through." She later described the odor as being "terrible * * * it stayed in the house practically a week before it cleared out."

Not more than half an hour after the car had been backed into the garage, Putnam came upstairs into the dining room with Mrs. Peters, sat down at the table with her, and said, "We are through * * * I will make out the contract for the beetles and the charge." He made it out and she signed it. The bill was $374.80. She said, "That is more than I expected. I can't take care of that to-day." She offered him a check for $100, reminding him it was Saturday, and the banks weren't open. "Oh," he said, "I had forgotten about that. Why can't you give me the check for the whole thing, and I won't deposit it until Monday." She said, "No, I will give you a check for $100," and she made out and delivered the $100 check (payable to James Marsh), and he handed her the instrument identified at the trial as "State's Exhibit 1," reading as follows:

"GOLDEN SPREAD TERMITE AND
PEST CONTROL SURETY
BONDED CONTRACT

"The Golden Spread Termite and Pest Control contracts to check property each year at no cost the building (or buildings) described below for the sum of 374.80 dollars to be paid in full upon completion of work.

"This contract carries the guarantee that all work will be satisfactory.

"The guarantee will be in effect for 5 years for beetles from date work is completed.

"Renewable at: the end of five years.

"GOLDEN SPREAD TERMITE
& PEST CONTROL
"By James Marsh
"Accepted by Mrs. H. H. Peters

"Street Number 35 10 Gladstone City K. C., Mo.
"Date 1–14–61 Description of building to be 466 dwelling home.
"Repairs Retreated for termites and treated for beetles

"Paid $100.00 Balance Due $274.00"

Putnam then left, and as the other two were waiting for him in the garage, Mrs. Peters went to the telephone book "to check this Golden Spread Termite & Pest

Control Company," but she found no such company listed, nor even the name of James Marsh. Whereupon she realized something was wrong. The men returned Monday morning to collect the balance of the money she had agreed to pay, but Mrs. Peters was then at the Better Business Bureau complaining of the transaction, and in the meantime she had stopped payment on her check. They returned again early the following (Tuesday) morning "and wanted their money," but Mrs. Peters told them to return at 2 o'clock that afternoon. By prearrangement with a police sergeant, he was present when the trio returned that afternoon to collect the remaining $274.00 balance due under the "contract." They were taken into custody at that time, and subsequently charged.

The state called as a witness Chappie Clark, an employe of Orkin Exterminating Company, a national concern. He had had extensive experience in Kansas City in powder post beetle and termite control work, and qualified as an expert in that field. From his testimony it appears that activity of powder post beetles, and their consequent damage, is indicated by sawdust or a residue around their holes. "They make an emergence hole in the wood * * * a very fine sawdust silts down out of these holes." High pressure spraying and fumigation are the two recognized methods of control. Only the former is utilized in the Kansas City area. It involves the application under pressure of an oil-base chemical to the point of runoff, this by means of a pressure tank. The fumigation method can be, but it is not used in the area in question. Under the latter method, the building to be treated must be either completely covered (as by tarpaulins) or else all apertures (windows, doors, and other openings that would allow the gas to escape) must be sealed up with masking tape or a grease substance. Both methods require a prior thorough inspection of "all wooden members in the building, such as the floor joists, flooring, window sills, door casements, any wooden parts of the building," from which

inspection one is enabled "to recognize damage done by powder post beetles, also subterranean termites." The Peters basement was a closed basement with a closed plaster ceiling. In order to have made even a proper inspection of that basement for powder post beetles, it would have been necessary "to remove the plaster ceilings," and "it would be necessary to remove these ceilings in order to properly treat the subflooring." This the defendants did not do, as was disclosed by an inspection of the premises made by the witness on January 18, just four days after defendants had been there. Such inspection was made at the request of the police, and embraced not only the basement area, but the connected garage as well, and extended to both powder post beetle and termite activity and damage.

According to the further testimony of this witness, someone had attempted some kind of recent treatment in the basement. "Some" small holes had been knocked out in the ceiling, and these were the only areas that were visible for inspection. The witness found no visible evidence of beetle activity. There had been in some of the subflooring, but this had obviously occurred prior to the time it was installed in the building (as indicated by saw marks exposing powder post beetle holes running vertically in the food with sawdust deposits still remaining, whereas if done after being installed in the building, only the round emergence holes would have been detectable). The subflooring was covered with a hard wood (preferred by beetles because it contains more cellulose than the soft wood), but there was no evidence that the hardwood flooring had been attacked by any powder post beetles at any time. There was present an odor of some chemical similar to that of pentachlorophenol (a wood preservative). The latter chemical is not used for powder post beetles, but is commonly used in the control of subterranean termites. It could not be determined how much had been applied, but possibly to the saturation point in those small areas

in the ceiling that were open. So much for the basement.

As stated, the witness also inspected the garage. There he found signs only of former termite activity, and that was confined to one door casement, but there was no such activity present at the time of his inspection. It was exclusively in this one area that there was any sign or indication of any recent treatment for termites. It was there that the witness found there had been poured onto the door casement itself an oil-base chemical of some kind. The inspection was made in January, and the witness stated that normally termites are not active at that time of year.

The witness gave it as his opinion that the work, as he observed it, had not been done in a workmanlike manner, this because the ceilings in the basement were closed and for that reason there was no possible method of properly treating the unexposed areas, and because it would have taken approximately 8 to 12 hours for three men to properly treat the basement for powder post beetles, and that it would have taken three men approximately three days to treat the house for both powder post beetles and subterranean termites.

In concluding his direct examination, the state propounded the following question, and the witness was permitted to answer (over the objection of defendant), as follows:

"Q Mr. Clark, assuming that three men went into that house there in the basement and in the garage and spent from 30 minutes to an hour there and rendered a bill for their services for $374.80, do you have an opinion as to whether or not that would be a fair charge?

"MR. COSTELLO: I object to that, Your Honor, as being not an issue in here at all, immaterial, improper, doesn't prove any issue in this case.

"THE COURT: Overruled.

"Q (By Mr. Kennett) Do you have an opinion?

"A Yes, sir, I have an opinion.

"Q What is that, sir?

"A That it could not, the service could not have been rendered in that period of time for that amount of money."

The witness further stated that a fogging machine is electrically operated and is used "merely to apply chemical in void areas or other types of insects such as silver fish and crawling insects."

The arresting officer testified that Fields said he was the owner of the Golden Spread Pest Control Company, but that it did not have an occupation license in Kansas City; that its home office was in a house trailer in St. Charles, Missouri; that he was the sole owner of another company, Eagle, and had an occupation license under that name (Eagle's license was actually under the name of one Griffin, a relative); that he had used a pressure spray and fogging machine "out there in Mrs. Peters' home"; that he had used a gallon of chlorophenol in the fogging machine; that this chemical costs $2.75 a gallon, and they mixed it with ten parts of diesel fuel, the latter costing 22 cents a gallon. When asked how he arrived at the charge of $374.80 for the job, he could give no reason for using that figure; that he normally charged 22 cents per square foot, but he had no idea what the square foot area of the basement would be; that he had only a third grade education, and didn't know what it would come to; that they worked there at least an hour.

The arresting officer further testified that Putnam stated the name of Marsh was already on the contract when Fields gave it to him for delivery to Mrs. Peters, and that Fields told him to make it out for $374.80. Marsh, who was a brother-in-law of Fields, told the arresting officer that he stated to Fields at the time the $374.80 figure came up that he felt it was entirely too much to charge this lady. None of the three admitted signing the name "James Marsh" to the contract.

In essence, Fields' defense (if such it can be called) was that the job had not been completed, and this was weakly supported only by his bare statement and that of Marsh that their supply of chemicals had run out during the course of the work on Saturday morning. Nothing of the kind was even intimated to Mrs. Peters, or to the arresting officer, nor, for aught that appears, until the trial. And even if true, there was still no explanation of why collection was attempted to be effected before completion of the work, nor of Putnam's positive representation that they were through when he obtained Mrs. Peters' signature to the contract and check. Moreover, Mrs. Peters denied that they offered to do anything further in the way of work the several times they returned to collect the excess over the $100 already paid by her by check. Too, the man she had known as Marsh throughout her negotiations in connection with the work turned out at the trial to be Putnam.

All of the defendants were more or less itinerants. Fields, by his own admission, had been convicted and served a term in Algoa Reformatory for car theft. Putnam had been convicted in Indiana for assault and battery and served, as he admitted, a six months' sentence therefor. In view of the nature of the points presented for review, it would serve no useful purpose to detail the evidence on the part of the defendants, nor pause to point out the numerous weaknesses and glaring inconsistencies therein.

Section 561.450, under which defendant was charged, provides in pertinent part:

"Every person who, with the intent to cheat and defraud, shall obtain or attempt to obtain, from any other person, or persons, any money, property or valuable thing whatever by means or by use of any trick or deception, or false and fraudulent representation, or statement or pretense, or by any other means or instrument or device, commonly called 'the confidence game,' * * * shall be deemed guilty of a felony and upon conviction thereof be punished by imprisonment in the state penitentiary for a term not exceeding seven years."

■ The essence of the crime thus denounced is that the injured party must have relied upon some false or deceitful pretense or device and parted with his property. State v. Wilson, 223 Mo. 156, 166, 122 S.W. 701, 704. "A confidence game, within the meaning of statutes directed against it, is any scheme whereby a swindler wins the confidence of his victim and, by taking advantage of such confidence, swindles him out of his money or property. The confidence must be won by a trick, device, false representation, or swindling operation, and the property must be obtained by a betrayal of the confidence won. * * * The term 'confidence game' cannot easily be defined so as to cover all the cases falling within it, since schemes devised for the swindling of others 'are as various as the mind of man is suggestive;' the term has a relative and variable meaning, each case depending on its peculiar circumstances." 35 C.J.S. False Pretenses § 32. And see State v. Weber, (Mo.) 298 S.W.2d 403.

■ Under the evidence the jury could have reasonably found that Fields obtained Mrs. Peters' permission to enter her premises and inspect for termites under the false representation that he was doing so under her original and then outstanding termite control contract with him; then by falsely representing the presence of powder post beetle activity and damage, led her to believe it was necessary to treat her basement for them, and thereby induced her to permit him to proceed ostensibly with the work of extermination, and by pretending so to do, and by representing the operation would not be expensive, tricked her into signing the "contract" whereby she agreed to pay him $374.80 for a half an hour's time of three men and virtually no chemicals without receiving any benefit therefrom. The form of the so-called "contract" is patently fraudulent.

The use of it, coupled with the false representations and pretenses just outlined, and the attempted extortion of a wholly unconscionable sum of money for a worthless work product properly characterizes the activities of Fields and his associates as a swindling operation by means of "the confidence game." We hold the evidence amply supports the verdict, and that the court did not err in refusing to direct a verdict of acquittal.

■ The motion for new trial makes complaint against the state's main or verdict-directing instruction, being No. 2, but here again most of the matters sought to be asserted are not reviewable because of want of specificity.

One complaint is that it requires a finding "that the defendants did proceed with the treatment for termites and did exterminate the termites and in the next line requires the triers of the facts to find there were no termites present." The offending language (which we have italicized) immediately follows the hypothesization of the matters and things relied on as constituting "the confidence game" (the holding out and pretending that the premises were badly infested with termites and powder post beetles, and in need of immediate attention, etc.), and proceeds as follows:

" * * * and that the said Edith Lowe Peters being deceived thereby and relying upon the aforesaid trick, false and fraudulent statements, pretenses and confidence game, *did allow the said defendants to proceed with the treatment and destruction of the said termites and powder post beetles, if you so find,* [and] *that said defendants knew that the aforesaid premises were not infested with termites and powder post beetles,* if you so find, then you will find the defendants guilty of Confidence Game and so find in your verdict."

The sentence is awkwardly worded. It is grossly inept in its attempt to submit the element of treatment and destruction of both termites and beetles as being merely ostensible (as distinguished from real or bona fide), but even so, we think its sense and meaning is clear enough upon a reading of the whole sentence, and that the jury would not have been misled or confused by the omission to use a more apt term qualifying the kind or type of treatment and destruction (such as "supposed," "pretended," or words of similar import). We do not regard the instruction as constituting a comment on the evidence, as charged, nor that it was "so confusing that the triers of the fact could not possibly have applied it as a statement of the law to the evidence introduced."

■ The motion for new trial assails the form and sufficiency of the verdict as not sufficiently identifying the "crime and overt act the jury found the defendants guilty of committing." The verdict reads as follows:

"We, the jury, find the defendant, Richard Lee Fields, guilty of Confidence Game and assess his punishment at three years in the State Penitentiary.

(Signed) Charles A. Scott,

Foreman."

It must be conceded that this, too, is needlessly awkward and inaccurate phraseology. Section 561.450 does not denominate "the confidence game" as a separate, substantive crime, such, for example, as burglary, stealing, robbery, etc., and it is a misnomer to so designate it. It is rather a means or method specifically enjoined by the statute in carrying out the prohibited obtention of money or property, or the attempt so to do, by trick, deception, or false pretenses. Here the defendant was charged with attempting to obtain money by trick, false pretenses, etc., by means of the confidence game. It would have comported more with recognized legal forms and proper procedure for the verdict to have expressly so found, e. g., "We, the jury, find the defendant, Richard Lee Fields, guilty of attempting to obtain money by false pretenses by means or use of 'the confidence game.'" Even so, we deem the verdict

sufficient under the following rule: "A verdict is not tested by technical rules of construction. If its meaning is clear upon the record (the charge, the evidence and the instructions), it is not void for uncertainty. State v. Smith, 284 Mo. 168, 172, 223 S.W. 749, 750; State v. Villinger, Mo., 237 S.W.2d 132, 134 [6, 7], and cases cited." State v. Russell, (Mo.) 265 S.W. 2d 379, 382. It appears that the faulty wording of the verdict was perhaps influenced by local practice in so designating the offense. Indeed, starting with proceedings in the Magistrate Court, we find several recitals in the record solemnly alleging or finding that defendant did "then and there unlawfully Confidence Game." This is no excuse for perpetuating grotesque and distorted nomenclature which is so inaccurate as to be confusing, if not practically meaningless. It is easy enough to conform to recognized standards.

We have examined the other portions of the record, as is our duty under Rule 28.02, and find no reversible error in it. The judgment is affirmed.

All of the Judges concur.