STATE of Missouri, Plaintiff-Respondent,

v.

Mabel LEIMER, Defendant-Appellant.

No. 8300.

Springfield Court of Appeals.

Missouri.

Oct. 5, 1964.

Kennedy & Tindel, Nevada, for defendant-appellant.

Wm. G. McCaffree, Nevada, for plaintiff-respondent.

STONE, Judge.

Defendant, Mabel Leimer, was charged by information with the misdemeanor of practicing medicine without a license. Secs. 334.010 and 334.250; Laws of 1959, S.B. No. 50.[1] Upon trial, the jury returned this verdict: "We, the jury, find the defendant, Mabel S. Leimer, guilty of practicing medicine without a license between March 19, 1962 and April 7, 1962 by applying certain substances and bandages to the face of Fred Gump in treatment of a bodily infirmity, professing to cure the same, of the said Fred Gump and assess her punishment at ————." The jurors having failed to declare the punishment by their verdict [Rule 27.03; Sec. 546.440], the court fixed and assessed the punishment at a fine of $250 and imprisonment in the county jail for a term of sixty days. See Secs. 334.250 and 556.270.

Defendant, forty years of age at the time of trial, identified herself as a "naturopathic physician,"[2] who had practiced as such since 1951 in Nevada, Missouri. The sign on the front of her home, where her office was located, read "Dr. M. S. Leimer, N.

[1] Section 334.010 is as follows: "It shall be unlawful for any person not now a registered physician within the meaning of the law to practice medicine or surgery in any of its departments, or to profess to cure and attempt to treat the sick and others afflicted with bodily or mental infirmities, or engage in the practice of midwifery in this state, except as herein provided." The pertinent portion of Section 334.250 is as follows: "1. Any person who violates section 334.010 shall, upon conviction, be adjudged guilty of a misdemeanor for each and every offense; and treating each patient is considered a separate offense. * * *" (Except as otherwise specifically noted, all statutory references are to RSMo 1959, V.A.M.S., and all references to rules are to the Supreme Court Rules of Criminal Procedure, V.A.M.R.)

[2] The Dictionary of Occupational Titles, Vol. I (2nd Ed., March 1949), published by the U.S. Department of Labor and offered in evidence by defendant's counsel, defines a "naturopath" as "a healer [who] treats patients with a system of physical culture and drugless treatment of disease by methods supposed to stimulate or assist nature." For other definitions, see State ex rel. Collet v. Scopel, Mo., 316 S.W.2d 515, 516.

D. Physician" ("N.D. * * * stands for naturopathic physician"), her professional cards identified her as "Dr. M. S. Leimer, Naturopathic Physician," and she was so listed in the Nevada telephone directory. Testifying in her own behalf, defendant freely admitted that she had treated patients for a wide variety of conditions and diseases, including boils, tonsilitis, mumps, gall stones, liver disturbances, multiple sclerosis and cancer.

Fred Gump, a farmer residing five miles northwest of Fulton, Kansas, had been afflicted with skin cancers. In 1957, Dr. Vernon A. Berky, a medical doctor specializing in radiology and practicing in Pittsburg and Fort Scott, Kansas, had given Gump a series of ten x-ray treatments for "a firm, rounded mass in the central part of his chin below the lip," which the pathological report showed to have been "a basal cell epithelioma of the chin"—"the most common type of skin cancer." Following this series of treatments, the affected area had "the characteristic reaction," then healed over, and "looked for all apparent purposes [as though] it was well." However, Dr. Berky kept Gump under observation, examining him from time to time over a period of more than four years. During that interval, the doctor treated other smaller skin cancers on Gump's face and the back of his neck but administered no further treatment to the chin. In the latter part of 1961, there was a recurrence of the chin cancer with an ulcerated area of the same appearance as that treated in 1957. But, by reason of the x-ray treatments by Br. Berky in 1957 and "contact radium" to the chin by another radiologist (not identified in the record) prior to 1957, Dr. Berky doubted in 1961 whether "it would be safe to use" additional radiation on the same area. Accordingly, he so advised Gump and told him that "the next treatment, I felt, would have to be surgical excision and plastic surgery." In the words of patient Gump, Dr. Berky "advised me to go to Kansas City and have my chin cut out."

Shying away from this surgical assault, Gump drove across the Missouri-Kansas line to Nevada and talked with defendant, who told him (so he testified) "that she would heal it, would get rid of it and heal it up, and it wouldn't cause me hardly no scar." She also stated that she "had treated other people" and showed him four or five bottles in which she had preserved "cancers * * * that she had taken off from other men." Still undecided as to what he should do, Gump told defendant that he wanted to counsel with his son at Paola; but, when he later did so, the son offered nothing more helpful than "pop, it's your chin, you'll have to be the judge." Having heard of "a man in Fort Scott that had one taken off of his neck" by defendant, Gump talked with that patient (here unidentified by name), and "he advised me [Gump] to go over and * * * went over with me" on March 19, 1962. On that date, Gump entrusted himself to defendant's care, and she gave him the first of a series of fourteen "treatments," all of which were administered in her office.

When asked by her counsel to "explain to the jury what sort of treatment you did use in treating Mr. Gump's ailment," defendant responded: "Well I used a cancer pack on him; it was an ointment that I put on him. You have to put it on as many times as it is needed until it [the cancer] turns loose and then after it turns loose, why then it falls out of its own accord and then you start the healing process." According to defendant, the ingredients in the ointment were "various herbs that I mix up." Whatever the ointment may have contained, its effect was drastic in nature and revolting to behold. As described by Gump's daughter who came from her home in Iowa about March 29, 1962, and accompanied her father to defendant's office several times, the area where the ointment had been applied and covered with bandages "was black just like it had been burned, like you would put a steak in charcoal and burn it until it was black," his face was swollen, his lower lip was swollen and

"turned under," his tongue was so swollen that he was "unable to work" it and "could hardly talk," and his nourishment was confined to liquids taken with difficulty through plastic straws. By April 16, 1962, when (at his daughter's insistence) Gump terminated the series of treatments by defendant and was driven to the University of Kansas Medical Center, his lower lip and the flesh on his chin had "fallen off" and "the whole front of his chin was gone completely to the bone."

Upon trial, defendant readily agreed that she had diagnosed Gump's condition "as cancer" and that she had "treated him" on fourteen listed dates between March 19, and April 16, 1962. She also gave this testimony without objection or motion to strike: "Q. Did you profess to cure him? A. Yes, I would have but he didn't come all the full time because when he came I told him if he starts this that I want him to come and see it through, which he did not do; he stopped in the middle of the treatment, so when anyone stops I am no longer responsible for it. Q. Do you admit that this treatment was a treatment to cure or alleviate his bodily infirmity of cancer? A. Yes, it would have if he had continued coming." Gump paid defendant $5 in cash for each treatment and an additional $3 or $4 for some "pain tablets" and a remedy for constipation which defendant dispensed on two or three occasions.

Represented here by the same counsel who defended her in the circuit court, defendant has filed a brief in which all of her "points relied on" challenge the legal sufficiency of the verdict hereinbefore quoted in the first paragraph of this opinion. The gist of defendant's points, of which we treat collectively, is that the verdict was fatally defective because it was a *special* verdict which did not find all of the essential elements of the offense charged, as a verdict in that form must do to be legally sufficient. In support of this position, defendant cites and relies upon four Missouri cases,[3] in each of which the verdict was called a special verdict and, as such, was held insufficient for failure to find all essential elements of the offense charged. Three of those cases [State v. Mitnick, 339 Mo. 127, 96 S.W.2d 43; State v. Thompson, Mo., 29 S.W.2d 67; State v. Griffin, 278 Mo. 436, 212 S.W. 877] were included among the cases listed and discussed in State v. Saussele, Mo., 265 S.W.2d 290, 293, where it was pointed out that the verdicts in the listed cases "were not true special verdicts" [265 S.W.2d loc. cit. 293–294] and the opinion in effect "overruled [this] list of cases dealing with special verdicts." State v. Blake, Mo., 309 S.W.2d 632, 635. Even prior to the opinion in Saussele, supra, the fourth case cited by instant defendant [State v. Holland, 162 Mo.App. 678, 145 S.W. 522] properly had been characterized as "out of harmony" with opinions of the Supreme Court and as "not * * * even persuasive" [State v. McCorkendale, Mo., 300 S.W. 815, 818] and later had been laid aside again as "overruled." State v. Villinger, Mo., 237 S.W.2d 132, 134–135.

The perspicacious author of the opinion in Saussele, supra, observed that *prior* cases in this jurisdiction "actually seem to have been decided on the basis of definiteness, certainty and responsiveness of the verdict." 265 S.W.2d loc. cit. 294. Certainly that has been true with respect to *subsequent* Missouri cases. In making such determination as to whether or not a given verdict is sufficiently definite, certain and responsive to support a conviction, our courts have recorded and reiterated statements of principle to which we now turn.

" '[I]n determining the sufficiency of a verdict, the controlling object is to learn the intent of the jury; and, if such intent may be ascertained and the verdict made definite and certain by reference to the pleadings and instructions, it will be

---

3. State v. Mitnick, 339 Mo. 127, 96 S.W. 2d 43; State v. Thompson, Mo., 29 S.W. 2d 67; State v. Griffin, 278 Mo. 436,

212 S.W. 877; State v. Holland, 162 Mo. App. 678, 145 S.W. 522.

sustained * * * .' " [4] "The verdict of a jury, even in a criminal case, is not to be tested by technical rules of construction." [5] " '[V]erdicts should be liberally construed in view of the intention of the jury and of the issues presented and all reasonable presumptions are indulged to sustain a verdict.' " [6] " 'It is a wholesome precept that verdicts should be given a reasonable intendment and a like construction, and are not to be avoided unless it is evident they will work manifest injustice.' " [7]

■ Finally, but certainly not least importantly, a standard frequently employed in determining the legal sufficiency of the verdict in a criminal case is that the verdict must be sufficiently definite and certain " 'that upon the entry of a judgment thereon it would have constituted a bar to a further prosecution * * * for the same offense.' " [8]

■ Defendant emphasizes that Section 334.030, RSMo 1949, under which charges of practicing medicine without a license were prosecuted in earlier cases, was repealed in 1959 [Laws of 1959, S.B. No. 50]; but, as was noted in State v. Errington, Mo., 355 S.W.2d 952, appeal dismissed 371 U.S. 3, 83 S.Ct. 27, 9 L.Ed.2d 48, "the substance thereof was reenacted"[355 S.W.2d loc. cit. 954] and "the offense of practicing medicine without a license was reenacted" [355 S.W.2d loc. cit. 958] in the same bill in what are now known as Sections 334.010 and 334.250. And, from the hereinbefore-quoted statements of principle and from examination of the cases, it becomes clear that, contrary to instant defendant's contention, a verdict strictly following the language of Section 334.010 is not essential to a valid conviction thereunder.[9] Nor is the instant verdict legally insufficient for failure to include "as charged in the information" [10] or for failure to incorporate a finding that the acts complained of were done in the State of Missouri.[11] Measured by the rulings in the cited cases and tested by the applicable standards therein stated, the instant verdict

4. State v. Marks, Mo., 376 S.W.2d 116, 118; State v. McCarthy, Mo., 336 S.W.2d 411, 417(10), 418; State v. Lovitt, 243 Mo. 510, 522, 147 S.W. 484, 487. See also State v. Fields, Mo., 366 S.W.2d 462, 469(9); State v. Ash, Mo., 286 S.W.2d 808, 811(6); State v. Russell, Mo., 265 S.W.2d 379, 382(7), 45 A.L.R.2d 617.

5. McCarthy, supra, 336 S.W.2d loc. cit. 417(11); State v. Perry, Mo., 233 S.W.2d 717, 720(4); State v. Turpin, 332 Mo. 1012, 1019, 61 S.W.2d 945, 948(14). See State v. Dimmick, 331 Mo. 240, 247, 53 S.W.2d 262, 265.

6. Perry, supra, 233 S.W.2d loc. cit. 720(5); State v. Meinhardt, Mo., 82 S.W.2d 890, 893(10); State v. Thomas, Mo., 82 S.W.2d 885, 889(11).

7. State v. Kennebrew, Mo., 380 S.W.2d 293, 295; State v. Saussele, Mo., 265 S.W.2d 290, 294(8); State v. Carter, Mo., 64 S.W.2d 687, 690; State v. Cutter, 318 Mo. 687, 692, 1 S.W.2d 96, 98 (11); State v. Jordan, 285 Mo. 62, 72, 225 S.W. 905, 907(5).

8. Kennebrew, supra, 380 S.W.2d loc. cit. 295; Saussele, supra, 265 S.W.2d loc. cit. 294(9); Jordan, supra, 285 Mo. loc.

cit. 73, 225 S.W. loc. cit. 907. See State v. Newstead, Mo., 280 S.W.2d 6, 11, certiorari denied 351 U.S. 956, 76 S.Ct. 857, 100 L.Ed. 1479.

9. Fields, supra, 366 S.W.2d loc. cit. 468 (7-9); McCarthy, supra, 336 S.W.2d loc. cit. 417-418; Saussele, supra, 265 S.W.2d loc. cit. 292, 294-295(10). See also State v. Villinger, Mo., 237 S.W.2d 132, 134; State v. Birkner, Mo., 229 S.W.2d 674.

10. State v. Lorts, Mo., 269 S.W.2d 88, 92(12); Saussele, supra, 265 S.W.2d loc. cit. 294(5); State v. Russell, supra, 265 S.W.2d loc. cit. 382(8); State v. Ward, 356 Mo. 499, 202 S.W.2d 46, 47-48(1); State v. Wright, 342 Mo. 58, 112 S.W.2d 571, 575(10).

11. Compare the verdicts on which convictions were affirmed in Felds, supra, 366 S.W.2d loc. cit. 468; McCarthy, supra, 336 S.W.2d loc. cit. 417; State v. Cox, Mo., 333 S.W.2d 46, 50; Lorts, supra, 269 S.W.2d loc. cit. 92; State v. Rutledge, Mo., 267 S.W.2d 625; Birkner, supra, note 9; Dimmick, supra, 53 S.W.2d loc. cit. 265; State v. Baublits, 324 Mo. 1199, 27 S.W.2d 16, 19.

was sufficiently definite, certain and responsive.

■ Since defendant here filed a brief in which she attacked only the legal sufficiency of the verdict, other assignments of error in her motion for new trial in the circuit court have been waived or abandoned. Rule 28.02; State v. Smith, Mo., 365 S.W.2d 505(1). We find no prejudicial error in other parts of the record which, under Rule 28.02, are examined independently of the motion for new trial.

The judgment is affirmed.

RUARK, P. J., and HOGAN, J., concur.