STATE of Missouri, Respondent,

v.

**Charles Warren SHAW, Appellant.**

No. 74790.

Supreme Court of Missouri,
En Banc.

Feb. 23, 1993.

---

J. Russell Carnahan, Rolla, for appellant.

William L. Webster, Atty. Gen., Douglas M. Ommen, Karl F. Findorff, Asst. Attys. Gen., Jefferson City, for respondent.

ROBERTSON, Chief Justice.

The State charged Charles Shaw ("Shaw") with four counts of unlawful merchandising practices in violation of Section 407.020, RSMo 1986,[1] a Class D felony. Following a bench trial, the trial court convicted Shaw on each count and sentenced

---

1. All references are to Missouri Revised Statutes, 1986, unless otherwise noted.

him, as a prior offender[2] under Section 557.036, to four concurrent four-year terms. Shaw appealed to the Court of Appeals, Southern District, challenging, among other things, the constitutionality of Section 407.020 on due process grounds. We have exclusive appellate jurisdiction of appeals challenging the validity of statutes. Mo. Const. Art. V, § 3. Therefore, the court of appeals properly transferred the case to this Court. We affirm Shaw's conviction on all counts.

## I.

Among Shaw's claims is an attack on the sufficiency of the State's case against him. The evidence is restated below in the light most favorable to the trial court's judgment, including all reasonable inferences tending to support that judgment and ignoring all contrary inferences. *State v. Giffin,* 640 S.W.2d 128, 130 (Mo.1982).

Shaw owned and operated Shaw's Pest Control, Inc., and Shaw's Security Home Repair in Dixon, Missouri. Shaw used his pest control business as a pretext to inspect his victims' homes and, apparently without conscience, "discover" the need for foundation repair work which his home repair enterprise would offer to provide.

## A.

As to the first count of the information, the evidence showed that Tom Shaw ("Tom"), Charles Shaw's nephew and partner, approached Mrs. Bernice Emmons, an 82–year–old woman who lived alone. Tom asked Mrs. Emmons for permission to inspect her basement for termites. Tom inspected the basement and found no termites, but informed Mrs. Emmons that the basement wall had several cracks that needed repair. Tom explained that proper correction of this problem required digging the earth from around the foundation to the bottom of the basement wall and sealing the cracks from the outside. At this point in the conversation, Shaw and Robert Richey, another employee of Shaw, joined

Tom and Mrs. Emmons. When Mrs. Emmons expressed some doubt and sought to delay the work until after the weekend, Tom indicated that he "had the men" and "wanted to start right off."

Tom proceeded to total an estimate for the foundation work and remarked as he did so that the back porch of Mrs. Emmons' house was "breaking away" and that "it needed some support under it." Shaw heard these representations, but said nothing. Tom finished the estimate and informed Mrs. Emmons that the men could complete the repairs for $4,000.00. When Mrs. Emmons hesitated, Tom dropped the price to $3,000.00. Mrs. Emmons signed the contract in the presence of Shaw; her initial down payment was deposited in the Shaw's Pest Control, Inc., bank account controlled by Shaw.

Workers began performing the work at Shaw's instruction. When they had dug but two feet, Shaw instructed the workers to "just go ahead and fill them back in. There's no sense in digging down to the footing." Turning from the uncompleted sealing of the basement cracks, Shaw's cohorts found that they could not raise the porch as promised. Instead, Tom told Mrs. Emmons that they would install supports to prevent further slippage.

The following day, in the presence of Shaw who stood mute, Tom told Mrs. Emmons that he noticed the kitchen floor and stairwell sagging badly. Tom also told Mrs. Emmons that her gutters needed repairing. Mrs. Emmons agreed to pay an additional $5,500.00 for Shaw's employees to install support beneath her kitchen, repair the gutters, and install a facia board and soffit. After "inspecting" the gutters more closely, Tom told Mrs. Emmons she needed new gutters. She agreed to pay an additional $2,000.00 for the gutters. In all, Mrs. Emmons paid Shaw's company $10,-500.00.

The State's experts testified that the work was unnecessary; that Shaw and his employees did not seal the basement cracks

2. Shaw had previously been convicted in Illinois of felony theft by deception and conspiracy to commit theft.

all the way down to the footings or install the facia board and soffit; that the brace installed under the porch did not reach the ground and thus offered no support; and that the reasonable and customary charge for the work that Shaw and his employees contracted to perform would have been $1,422.22.

## B.

The second count involved an elderly couple named Shults. The evidence showed that Tom sought and was granted permission from Mr. and Mrs. Shults to inspect their home for termites. When the Shultses agreed, Tom told Richey, as Shaw listened, to go under the house and "come out and tell [the Shultses] that the floor joists were sagging and that it needed a vapor seal put under the house." Richey complied. At Tom's further direction, Richey told the Shultses that their porch sagged and needed additional support or it would continue to sink.

Tom offered to complete the necessary repairs for $3,600.00, but told Mr. and Mrs. Shults that he would reduce the price to $3,000.00 if they would authorize the work immediately. After the 84–year-old Mr. Shults agreed, Shaw told his workers not to install the new joists as promised. Instead, doubting Mr. Shults' ability to inspect much of the work because of his age and poor eyesight, Shaw told the workers to "scab on" new pine boards to the outside of existing joists close to the accessway. That way, in case Mr. Shults were able to bend over and do a cursory inspection, he would see what appeared to be new joists.

The State's experts again testified that none of the work at the Schultses was necessary and, indeed, that some of the work had a detrimental effect on the structural integrity of the house. The State's experts testified that the reasonable and customary charge for the work, assuming it had been necessary, would have been $288.20. The record reveals that Shaw deposited the $3,000.00 paid by the Shultses in the Shaw Pest Control, Inc., bank account.

## C.

The third count of the State's information focuses on Mr. and Mrs. Vogt. The evidence showed that, while Shaw was overseeing the "work" on the Shultses' home, he invited Richey to accompany him to the nearby Vogt home to see if they could "pick up a thousand or two off Mr. and Mrs. Vogt." Shaw knew the Vogts; he had previously treated their home for termites.

Shaw went to the Vogts' door and asked to re-check the house for termites. The Vogts assented. Richey went under the house and emerged, in Shaw's presence, to tell the Vogts that their house sagged and needed additional support. Shaw assured the Vogts that the work was necessary to prevent extensive and costly future repairs. Shaw indicated that the repairs would cost $3,000.00, but offered to do the work for $1,800.00 because he had "a lot of cement on hand and didn't want to hold it over." In fact, Shaw had no cement on hand. His workers had to purchase cement before beginning work on the Vogt home.

Because of ill health, neither of the Vogts were able to confirm the need for the work or the manner in which it was performed. When they were told the job was finished, the Vogts made payments totaling $1,750.00. The State's experts testified that none of the work was necessary and, had it been necessary, the usual and customary charge would have been $152.34.

## D.

The fourth count of the information centers on Shaw's work for the 67–year-old Mrs. Alta Land. The evidence showed that following the same modus operandi, Shaw approached Mrs. Land and asked to inspect her home for termites. Mrs. Land agreed. Shaw ordered Richey to inspect under the house. When he emerged, Richey told Shaw that he had found nothing wrong. Shaw insisted that Richey tell Mrs. Land that she needed a new beam and floor joists. Richey complied. After Richey informed Mrs. Land of her "problems," Shaw assured her that her house would continue

to shift and settle without additional support. Shaw went into Mrs. Land's kitchen and remarked that the tile on the walls would crack and the ceilings could cave in if the house continued to shift. He told Mrs. Land that a fair price for the repairs would be $6,000.00 but, because she was a senior citizen on a fixed income, he would perform the work for $3,680.00 if she would agree to the contract that day. As with his other victims, Mrs. Land's poor health prevented her from confirming the "structural problems" Shaw had identified. She agreed.

When Shaw's workers discovered that there was no room under the house for all the supports that Shaw had promised, Shaw told them to "just forget about it. She [Mrs. Land] wouldn't know the difference."

After having secured a loan and after being told the job was completed, Mrs. Land paid Shaw the contract price. Again, the State's experts testified that none of the work was necessary and that if it had been necessary and had been performed properly, the reasonable and customary charge would have been $459.06.

## II.

Section 407.020 provides in pertinent part:

1. The act, use or employment by any person of any *deception, fraud, false pretense, false promise, misrepresentation, unfair practice* or the *concealment, suppression, or omission of any material fact* in connection with the sale or advertisement of any merchandise in

trade or commerce ... is declared to be an unlawful practice.

\* \* \* \* \* \*

3. Any person who *willfully and knowingly engages* in any act, use, employment or practice declared to be unlawful by this section *with the intent to defraud* shall be guilty of a class D felony.

[Emphasis added.] The amended four-count information tracks the language of this statute and avers that Shaw committed, or knowingly acted in concert with one who committed, the acts specified in the information with the intent to defraud the four named victims.

▮▮▮ Shaw contends that Section 407.-020 violates the due process clause of the Fourteenth Amendment to the United States Constitution and Article I, Section 10 of the Missouri Constitution.[3] Shaw's principal claim is that Section 407.020 is unconstitutionally vague in that it fails to give fair warning of the conduct it prohibits. He also contends that the statute fails to provide the explicit standards necessary to prevent arbitrary and discriminatory application. We address these two[4] arguments in reverse order.

## A.

▮▮ Regarding his claim concerning arbitrary and discriminatory enforcement, Shaw places principal reliance on a quote from *State ex rel. Webster v. Eisenbeis,* 775 S.W.2d 276, 277 (Mo.App.1989), which states:

To prevent easy evasions [Section 407.-020] purposely does not expressly define the deceptive or unfair conduct made un-

3. Shaw does not assert that the Article I, Section 10 of the Missouri Constitution reaches farther than the Fourteenth Amendment of the United States Constitution. Therefore, we need only address the validity of Section 407.020 in light of federal constitutional standards. *Cf. State v. Hester,* 801 S.W.2d 695, 697 (Mo. banc 1991) (equating Article I, Section 18 of the Missouri Constitution with the Sixth and Fourteenth Amendments to the United States Constitution).

4. In his motion to dismiss before the circuit court, Shaw raised "overbreadth" as an alterna-

tive basis for holding Section 407.020 unconstitutional. This was one of the "real and substantial" challenges cited by the court of appeals as requiring transfer. However, because Shaw failed to raise this ground in his points relied on to the southern district, he has abandoned this point on appeal. We note, *ex gratia,* that the point was wisely abandoned as the the overbreadth doctrine has no application to statutes that implicate only commercial speech. *See Village of Hoffman Estates v. Flipside,* 455 U.S. 489, 498, 102 S.Ct. 1186, 1193, 71 L.Ed.2d 362 (1982).

lawful but simply declares deceptive and unfair conduct to be unlawful and leaves it to the courts to decide whether fair dealing has been violated.

Since the legislature did not "expressly define" the conduct rendered illegal, Shaw concludes that the door is open for discriminatory application of this law in the future.

Because Shaw's overbreadth argument has been abandoned, *supra* note 4, Shaw must show actual arbitrary or discriminatory enforcement in his case. His only attempt to do so is to point out that his is the first prosecution under this statute since the criminal penalties were added in 1985. This is insufficient to demonstrate actual arbitrary or discriminatory enforcement and, accordingly, this part of Shaw's first point is denied. *State v. Mahurin,* 799 S.W.2d 840, 842 (Mo. banc 1990) ("Because a defendant's knowledge ... must be proven, the possibility of arbitrary convictions is negated.")

### B.

Regarding his void-for-vagueness argument, Shaw contends that the words "deception," "fraud," "false pretense," "false promise," "misrepresentation," and especially "unfair practice" are so devoid of any commonly understood meaning that persons of ordinary intelligence must necessarily guess at their meaning. Finding strength in numbers, the State responds that 39 states have similarly-worded statutes. The State points out that these "little Federal Trade Commission acts" are modeled after federal law containing similar language and asks us to notice that none of these acts, state or federal, has ever been held unconstitutionally vague. The State also cites a number of cases holding that statutory language, when vested with some degree of commonly understood meaning, is not rendered unconstitutionally vague simply because it is difficult to determine whether a particular act is within or without the prohibition. *See, e.g., United States v. National Dairy Products Corp.,* 372 U.S. 29, 32, 83 S.Ct. 594, 597, 9 L.Ed.2d 561 (1963) (selling dairy products below cost falls within the 15

U.S.C. § 13a proscription against selling "at unreasonably low prices"); *United States v. Gannon,* 684 F.2d 433, 439–40 (7th Cir.), *cert. denied,* 454 U.S. 940, 102 S.Ct. 475, 70 L.Ed.2d 248 (1981) (accepting gratuities for completing Torrens filings falls within 12 U.S.C. § 2607(b) proscription against "splitting unearned fees").

The difficulty with the State's "bandwagon" argument lies in its apparent failure to appreciate the distinction between statutes that permit civil penalties and those that impose criminal sanctions. *See, e.g., State v. O'Neill Investigations, Inc.,* 609 P.2d 520, 527, 533–34 (Alaska 1980) ("unfair or deceptive acts or practices" is not unconstitutionally vague, specifically noting that the statute authorizes only civil penalties); *State v. Reader's Digest Ass'n, Inc.,* 81 Wash.2d 259, 501 P.2d 290, 301 (1972) ("unfair or deceptive acts or practices" statute, authorizing only civil penalties, is not unconstitutionally vague). Indeed, of those states authorizing criminal sanctions, Missouri is the only jurisdiction that has chosen to make the commission of unfair merchandising practices, committed with an intent to defraud, a felony punishable by up to five years in prison. *Compare* § 407.020.3, RSMo.1986 (class D felony) *with, e.g.,* Ark.Code Ann. § 4–88–103 (Michie 1991) (authorizing only misdemeanor penalties for deceptive trade practices) *and* Nev. Rev.Stat. § 598.640 (1991) (same).

The possibility of criminal sanctions heightens the stakes and necessarily sharpens the focus of the constitutional analysis. As the United States Supreme Court has stated, "[t]he degree of vagueness that the Constitution tolerates—as well as the relative importance of fair notice and fair enforcement—depends in part on the nature of the [statute.]" *Village of Hoffman Estates v. Flipside,* 455 U.S. 489, 498, 102 S.Ct. 1186, 1193, 71 L.Ed.2d 362 (1982). Thus, statutes providing only civil penalties are held to a lower constitutional standard than are criminal statutes "because the consequence of imprecision is qualitatively less severe." *Id.*

The constitution does not, on the other hand, require the legislature to adhere to

impossible standards of specificity. *State v. Errington*, 355 S.W.2d 952, 955 (Mo. banc 1962). "In the case of a statute that defines a criminal offense, due process requires no more than that the statute convey sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices." *In re Trapp*, 593 S.W.2d 193, 202 (Mo. banc 1980).

■ These twin standards require this Court to balance the specificity of notice that the constitution demands of the legislature against the flexibility the legislature must have if it is to write criminal laws that can encompass all of the varieties of specific criminal behavior that it has chosen to punish. In striking this balance, this Court has determined that a void-for-vagueness challenge will not lie when a statute employs words that, though vague in the abstract, have come to have settled meanings within an area of the law. *See, e.g. State v. Brown*, 660 S.W.2d 694, 698 (Mo. banc 1983) ("cruel and unusual" has a settled common-law meaning and is not unconstitutionally vague as used in child abuse statutes).

■ Many of the words employed in Section 407.020 have acquired settled meanings in the law. For example, courts have grappled with scope of the term "fraud" hundreds, if not thousands, of times. *See, e.g., United States v. Bishop*, 825 F.2d 1278, 1280 (8th Cir.1987) ("The law does not define fraud; it needs no definition. It is as old as falsehood and as versatile as human ingenuity."). *See also Heberer v. Shell Oil Co.*, 744 S.W.2d 441, 443 (Mo. banc 1988) (reciting the traditional nine elements of "fraud"). Deception means, simply, "stealing by deceit." *State v. Perkins*, 380 S.W.2d 433, 435 (Mo.1964). Likewise, "false pretenses," "false promises" and "misrepresentation" have gained commonly understood meanings as identifiable species of fraud. *See State v. Herman*, 162 S.W.2d 873, 874 (Mo.1942) (false pretenses); *State v. Petty*, 119 Mo. 425, 425, 24 S.W. 1010 (1894) (false promises); *Packard v. KC One, Inc.*, 727 S.W.2d 435, 436–37 (Mo. App.1987) (misrepresentation). Through·

its use of these words, Section 407.020 draws on the common law of fraud in determining which practices it considers unlawful. *State ex rel. Danforth v. Independence Dodge, Inc.*, 494 S.W.2d 362, 368 (Mo.App.1973). Given the settled meaning of these words, we hold that the legislature's use of language so steeped in the common law does not violate constitutional requirements of specificity.

The same cannot be said, however, of the statutory prohibition against "unfair practices." Section 407.020 does not merely codify the law of fraud; it expands it. *Independence Dodge*, 494 S.W.2d at 368. In civil cases arising under Section 407.020, a plaintiff need not prove all the elements of fraud, nor any element of intent, in order to make a claim of unlawful merchandising practices. *State ex rel. Webster v. Areaco Investment Co.*, 756 S.W.2d 633, 635 (Mo.App.1988). The inclusion by the legislature of the words "unfair practices" signals a legislative intent to prohibit a much broader class of activities than those falling within the common law definition of fraud.

One can argue convincingly that, when Section 407.020 is invoked in its civil character, leaving the category of prohibited acts broad enough to permit the courts to delineate the limits of the prohibition on a case-by-case basis furthers the remedial purposes of the statute. However, when the statute imposes criminal sanctions, an "unfair practice" standard, without more, stretches too broadly to withstand a due process attack. "It would certainly be dangerous if the legislature could set a net large enough to catch all possible offenders, and leave it to the courts to step inside and say who should be rightfully detained and who should be set at large." *Papachristou v. City of Jacksonville*, 405 U.S. 156, 165, 92 S.Ct. 839, 845, 31 L.Ed.2d 110 (1972). Thus, were we forced to address the constitutionality of the phrase "unfair practices" in isolation, we might be hard-pressed to hold that that phrase is sufficiently definite to meet the demands of the constitution.

We do not, however, address the constitutionality of statutes in isolation. Instead, we construe the whole statute and we do so in light of a strong presumption of a statute's validity. *State v. Young*, 695 S.W.2d 882, 883 (Mo. banc 1985).

Section 407.020 does not permit convictions upon a mere showing that the defendant engaged in "unfair practices." The statute also requires the State to show that the defendant acted "willfully and knowingly ... with the intent to defraud." Section 407.020.3. The United States Supreme Court has recognized that "[t]his requirement of the presence of culpable intent as a necessary element of the offense does much to destroy any force in the argument that application of the [challenged provision] would be so unfair that it must be held invalid." *Boyce Motor Lines v. United States*, 342 U.S. 337, 342, 72 S.Ct. 329, 332, 96 L.Ed. 367 (1951). Similarly, the Court noted in *American Communications Association v. Douds*, 339 U.S. 382, 412–13, 70 S.Ct. 674, 691, 94 L.Ed. 925 (1950), that "since the constitutional vice in a vague or indefinite statute is the injustice to the accused in placing him on trial for an offense, the nature of which he is given no fair warning, the fact that punishment is restricted to acts done with knowledge that they contravene the statute makes this objection untenable." *See also State v. Ragen*, 314 U.S. 513, 524, 62 S.Ct. 374, 379, 86 L.Ed. 383 (1942) ("A mind intent upon wilful evasion is inconsistent with surprised innocence."); *Hygrade Provision Co. v. Sherman*, 266 U.S. 497, 502–503, 45 S.Ct. 141, 143, 69 L.Ed. 402 (1925) ("since the statutes require a specific intent to defraud in order to encounter their prohibitions, the hazard of prosecution which appellants fear loses whatever substantial foundation it might have in the absence of such a requirement."); *Screws v. United States*, 325 U.S. 91, 102, 65 S.Ct. 1031, 1036, 89 L.Ed. 1495 (1945) (requirement of specific intent "relieve[s] the statute of the objection that it punishes without warning an offense of which the accused was unaware.").

Though this rule has sometimes drawn criticism, *see Boyce Motor*, 342 U.S. at 345,

72 S.Ct. at 333 (Jackson, J., dissenting), it has never been overruled and is still applied today. *See United States v. Margiotta*, 688 F.2d 108, 129 (2d Cir.1982), *cert. denied*, 461 U.S. 913, 103 S.Ct. 1891, 77 L.Ed.2d 282 (1983) ("The broad language of the statute ... is not unconstitutionally vague because [the statute] contains the requirement that the defendant must have acted willfully and with a specific intent to defraud."). Indeed, this Court relied, in part, on this line of cases in rejecting a void-for-vagueness challenge in *State v. Dale*, 775 S.W.2d 126, 131 (Mo. banc 1989) ("requirement of knowledge is the saving grace of the criminal statute.").

We hold, therefore, that the scienter element of Section 407.020 sufficiently cures any uncertainty as to the meaning of the phrase "unfair practices" as used in that statute. A defendant cannot be found guilty unless the fact finder determines that he willfully and knowingly engaged in conduct that is unfair and that he did so with the specific intent to defraud his victim by means of the unfair practice.

In convicting Shaw, the trial court found he acted willfully, knowingly and with an intent to defraud. Thus, Shaw's argument that the statute is unconstitutionally vague because he did not know what "unfair" meant has, by virtue of the mens rea requirement, been reduced to nothing more than an ordinary attack on the sufficiency of the evidence supporting the trial court's findings. As we will discuss at IIIc, *infra*, the State presented sufficient evidence to support the trial court's findings. As to the constitutional challenge to Section 407.-020, Shaw's point is denied.

### III.

#### A.

Shaw next argues that the trial court erred in allowing Robert Richey to testify as to the out-of-court statements of Shaw's nephew, Tom. Shaw claims these statements are hearsay and are inadmissible because they do not fall within the exceptions to the hearsay rule for adoptive ad-

missions or statements of coconspirators. The State argues that the trial court properly admitted the statements under either the res gestae, adoptive admissions or coconspirators' exceptions. Both arguments miss the mark.

■ The necessity of determining whether these statements qualify as exceptions to the hearsay rule depends, initially, on whether the statements are hearsay. Hearsay is testimony containing an out-of-court statement, not made by the declarant nor under oath, offered to prove the truth of the matter asserted therein. *State v. Harris*, 620 S.W.2d 349, 355 (Mo. banc 1981).

■ Richey's testimony is not hearsay. First, Richey's testimony serves only to prove the fact that certain statements were made. Second, the State's case depends, in part, upon the fact that the statements were *false* when made. Thus, any argument premised on an assertion that the statements are being offered to prove the truth of the matters contained therein, must surely fail. Richey's testimony concerning Tom's statements was relevant to the issue of fraud and the trial court did not err in admitting it. Shaw's second point is denied.

**B.**

At trial, the State introduced evidence of four similar incidents involving Shaw in addition to the four incidents charged. The first two of these incidents occurred *prior* to November, 1988, the latest incident charged in the information. The first of these occurred in May, 1988, when Shaw falsely represented to an elderly homeowner that "her house was going to fall down" if additional joists and beams were not installed. The homeowner elected to contact her builder rather than rely on Shaw's representations. As a result, Shaw did not perform any work. The second of these incidents occurred in September, 1988, when Shaw, charged an elderly couple $3,600.00 to install additional structural support that the State's experts testified was unnecessary. Despite being legally blind and 72 years old, this victim inspected

Shaw's work and determined that the supports were loose at the bottom and, thus, provided no support whatsoever. Shaw, apparently conceding the validity of the State's inference of intent based on evidence of *prior* uncharged acts, does not argue that the admission of this evidence was error.

Shaw does object, however, to the State's use of evidence of the last two incidents; those that occurred *after* November, 1988. In the first of these "subsequent" acts, Shaw again under the guise of a termite inspection, falsely stated that the floors of another homeowner's house were in danger of collapsing without additional support. This homeowner contracted with Shaw and paid $9,500.00 for work that the State's experts testified was unnecessary, and, in any event, should not have cost more than $777.00. The other "subsequent" act also involved an elderly homeowner and Shaw's representation of severe structural deficiencies. This homeowner, however, wisely sought a second opinion and then contacted the state Attorney General's Office upon learning the truth. This complaint led to the State's investigation and resulted in the criminal charges filed against Shaw.

Shaw argues that the evidence of these last two incidents was inadmissible as evidence of *other crimes*; that evidence of Shaw's subsequent acts is not relevant to any material issue; and that any probative value of this evidence is substantially outweighed by its potential for unfair prejudice. Specifically, he argues that evidence of subsequent conduct cannot be relevant to prior state of mind. Therefore, Shaw concludes, the State must have introduced the evidence simply to depict him to the jury as a bad person with criminal propensities.

■ The challenged evidence is, as Shaw suggests, evidence of uncharged crimes. The general rule prohibiting evidence of uncharged crimes is no less applicable where the conduct occurred after the charged crimes than where the evidence is of "prior" crimes. *State v. Sladek*, 835

S.W.2d 308, 313 n. 1 (Mo. banc 1992) (J. Thomas, concurring). Where evidence of the defendant's uncharged criminal conduct has no "legitimate tendency to directly establish [ ] guilt," that evidence may not be admitted. *Id.* at 313. Where such evidence is directly relevant to some disputed material fact, and thus serves a legitimate purpose rather than merely indicting the defendant as a "bad person" with a propensity to commit this particular type of crime, the prior crimes rule is no bar.

The State argues that the challenged evidence is relevant circumstantial evidence that tends to show that Shaw possessed the requisite knowledge, willfulness and intent to defraud his victims in the incidents alleged in the information. The inference the State seeks to raise, that a person who repeatedly acts to produce certain results can be said to have intended those results in all such similar incidents, is no less valid when raised by showing acts subsequent to the charged incidents as it is when shown with acts prior to the charged incidents. This Court has stated that:

> It is and long has been the general rule that in false pretense cases evidence of attempts to commit other similar offenses *either before or after the one on trial,* if not too remote, is competent to prove the scienter intent of the accused, that being an essential ingredient of the crime.

*State v. Hotsenpiller,* 359 Mo. 1031, 1036, 224 S.W.2d 1014, 1017 (1949). [Emphasis added.]

■ The admission of evidence of prior and subsequent crimes is common in cases involving fraud or false pretenses because the required mental states must ordinarily be shown by circumstantial evidence. *State v. Inscore,* 592 S.W.2d 809, 811 (Mo. banc 1980). The fact that on subsequent occasions Shaw used, himself and through his agents, the same means to perpetrate the same fraud on the same identifiable class of victims is some evidence from which the finder of fact could conclude that Shaw possessed the required mental state of knowledge, willfullness and

intent to defraud in each of the four incidents charged in the information.

■ The remoteness in time of the other bad acts is ordinarily a factor affecting only the weight afforded the evidence. *State v. Thurman,* 692 S.W.2d 317, 319 (Mo.App.1985). Where, however, the remoteness is so great that it erodes the probative value of the evidence, the prejudicial effect outweighs its probative value and the evidence is not admissible. *Id.* In *State v. Hartman,* 364 Mo. 1109, 1118, 273 S.W.2d 198, 204 (banc 1954), this Court determined that evidence showing the defendant had committed a similar crime two months after the charged crime was not so remote as to defeat its admissibility. *Inscore* permitted the introduction of evidence up to seven months after the charged incident to show the defendant's "intent to cheat and defraud." *Inscore,* 592 S.W.2d at 811–12. *State v. Stegall,* 353 S.W.2d 656, 658 (Mo.1962), held that conduct occurring fourteen months after the charged conduct was too remote and thus not admissible.

In the present case, the crimes in the information occurred between July, 1988 and November, 1988. The challenged evidence concerned events occurring in January, April, and May, 1989. The most remote of this evidence occurred within approximately six months of the *latest* charged event; all of the evidence of uncharged acts occurred within one year of the *earliest* charged crime.

■ We hold that this evidence was not so remote as to be inadmissible. This conclusion is compelled by the high degree of similarity between the approaches used, the type of victims chosen, and the frauds practiced in both the charged and uncharged crimes. Where, as here, all of the evidence, both charged and uncharged, occurs within a 12–month period, the evidence is admissible. We need not decide either whether the *Stegall* standard should stand, or whether the line between *Stegall* and *Inscore* is properly drawn. Determinations of this nature must proceed on a case-by-case basis balancing both factors of time and similarity. The point is denied.

### C.

Shaw finally challenges the sufficiency of the evidence to support his conviction beyond a reasonable doubt. He claims that the State failed to put on sufficient evidence that he acted knowingly and willfully in committing the crimes charged.

 Shaw waived his right to a jury trial and, on appeal, the trial court's judgment is afforded the same deference as a jury's verdict. Rule 27.01 Viewing the evidence in the light most favorable to the State, we will affirm the trial court's judgment if there is substantial evidence to support its findings. *Giffin*, 640 S.W.2d at 130. This standard recognizes the ability of the trial court to see, hear, and judge the witnesses in person, rather than from the cold record with which we are left on appeal. *State v. Blankenship*, 830 S.W.2d 1, 16 (Mo. banc 1992).

 Shaw claims that he cannot be held criminally responsible because he did not personally inspect any of the homes, that he did not personally perform any of the work, that he did not personally sign the sales contract in at least one of the incidents, and that he did not personally make any misrepresentations in two of the cases. The State responds that it need not show that Shaw personally performed any of the acts because the amended information charged him with committing these acts alone "or knowingly in concert with others." The State argues that it need only show that Shaw possessed the requisite mental state, and with that intent, acted in concert with others to violate Section 407.-020. As set out in Section I, above, there was substantial evidence to support a finding that Shaw committed, and acted in concert with others who committed, the acts charged. Also, as discussed in the preceding section, there was substantial evidence to support a finding that he did so with the requisite mental state.

This Court has twice upheld the sufficiency of the evidence in strikingly similar cases arising under Missouri's former false pretenses statute, Section 561.450, RSMo 1969 (repealed, January 1, 1978). *See State v. Fields*, 366 S.W.2d 462, 467–68 (Mo.1963) (defendant attempted to charge exorbitant amount to rid 79–year–old homeowner of nonexistent powder-post beetle infestation), and *State v. Smith*, 324 S.W.2d 702, 704 (Mo.1959) (defendant deceived elderly victim by conducting cursory inspection, falsely declaring that the wiring was so deficient that a fire could start at any moment and charging an exorbitant amount to do unnecessary repairs). In each case, the jury properly inferred the necessary intent to defraud from the surrounding circumstances. *Fields*, 366 S.W.2d at 468; *Smith*, 324 S.W.2d at 705.

The evidence in the present case, both direct and circumstantial, is no less compelling. This evidence formed a sufficient basis from which the trial court could conclude, beyond a reasonable doubt, that Shaw was guilty on each of the four counts of unlawful merchandising practices.

The point is denied.

### IV.

The judgment of the trial court is affirmed.

All concur.