STATE of Missouri, Respondent,

v.

Clifford A. INSCORE, Appellant.

No. 61124.

Supreme Court of Missouri,
En Banc.

Jan. 15, 1980.

Rehearing Denied Feb. 11, 1980.

Carl F. Sapp, Columbia, for appellant.

John Ashcroft, Atty. Gen., Paul Robert Otto, Kristie Green, Asst. Attys. Gen., Jefferson City, for respondent.

HIGGINS, Judge.

Appeal from judgment on conviction by a jury of perpetrating a confidence game in violation of § 561.450 RSMo 1969, transferred from the Court of Appeals, Eastern District, after divided opinion on whether the State made a case and whether the court erred in connection with the State's argument. Affirmed.

On January 27, 1976, Inscore went to a feed store, operated by Donald Elsberry in Vandalia, Missouri, and said he wanted to buy animal health supplies. After listing what he wanted, the supplies were loaded on his truck. Elsberry made out the sales ticket showing purchases of $465. Inscore then asked if he could have thirty days credit; Elsberry agreed on the condition that Inscore sign the ticket, which he did. After thirty days, Elsberry sent Inscore a statement. The bill was never paid despite repeated requests for payment.

■ To convict under § 561.450, the State must charge and prove: (1) defendant obtained goods from another person; (2) by means of false or fraudulent representation; (3) with the intent to cheat and defraud.

■ Appellant claims the information failed to charge an offense under § 561.450. The information alleged: that on January 27, 1976, Inscore obtained animal health products valued at $465 from Donald Els-

berry by means of false and fraudulent representation with the intent to cheat and defraud him. The information alleges the elements required under the statute in the language of the statute, and is thus sufficient. *State v. Tandy*, 401 S.W.2d 409 (Mo. 1966).

Appellant contends the evidence was not sufficient to prove the elements of the crime. There is no dispute that defendant obtained the goods from Mr. Elsberry; that in asking for and obtaining thirty days credit and signing the bill he represented that he would pay the amount due within thirty days; and that he did not, as represented, pay his bill within thirty days. At issue in appellant's contention, therefore, is the sufficiency of proof of the intent to cheat and defraud. Such proof is necessary for criminal sanction; failing its introduction, defendant is guilty of no more than breach of contract.

■ Before a jury is permitted to find a verdict of guilty where fraudulent intent is an element of the crime, there must be in connection with the act done, attending circumstances which bespeak fraud—a situation where common experience finds a reliable correlation between the act and a corresponding intent. *State v. Basham*, 568 S.W.2d 518 (Mo. banc 1978). The State must show that the intent to cheat and defraud existed as of the time the pretense was made. *State v. McWilliams*, 331 S.W.2d 610 (Mo.1960).

■ The subjective intent of the defendant at the time he made his promise is rarely open to direct proof. The mens rea, therefore, may be proved by means of circumstantial evidence. *State v. Schmidt*, 530 S.W.2d 424 (Mo.App.1975). In particular, to prove intent to defraud based upon a promise, the State may introduce evidence of similar incidents whereby the defendant obtained money from other victims by making some sort of promise. The theory which underlies admission of such evidence is that if a defendant consistently makes the same promise to a number of victims and, after obtaining the victim's money or goods, consistently fails to perform, it may be fairly inferred from the pattern of behavior that no mischance could reasonably explain all the failures of performance. Thus, the inference is raised that the defendant must have intended not to perform in any instance and particularly in the situation in which he has been charged. *State v. Basham*, 571 S.W.2d 130 (Mo.App.1978). Evidence at trial of the numerous similar transactions whereby appellant obtained feed products upon a promise to pay later then failed to do so was sufficient to establish the inference of intent to defraud in the Vandalia feed store transaction.

The following is a resume of the "similar incidents":

On September 11, 1975, Inscore purchased pig grower, protein blocks, and preconditioner worth $236.45 from Mexico Food and Seed Supply. Upon the representation he would pay in thirty days, he was extended credit; he signed the bill and departed with the merchandise. Despite repeated monthly statements and phone calls, the bill was not paid.

On January 13, 1976, Inscore purchased 300 pounds of hog medication worth $480 from the MFA Exchange in Perry, Missouri. When asked for payment, he took out his checkbook, said he had run out of checks and asked for credit. This was extended upon his promise he would send a check within thirty days. Payment was never received.

On January 27, 1976, the transaction in question took place.

In early February, 1976, Inscore offered to purchase the entire stock of ASP–250, a hog medication, at Producer's Grain Company in Montgomery City. When the assistant manager refused to extend credit, Inscore said, "If you don't want to charge it, I will give you a damned check." On his way into the company's office, he said, "I'm in a big hurry today and haven't much time" and did not make the purchase.

On February 18, 1976, Inscore purchased 200 pounds of CSP–250 from Producers Grain Company in Montgomery City, Missouri. In the usual pattern, he promised to pay within thirty days, signed the bill, took the goods on credit, and never paid for them.

On the same day, Inscore agreed to purchase 200 pounds of the same additive from Wilt Farm Center in Shelbina, Missouri. He was granted credit for the $287.40 bill when he claimed that he traveled through Shelbina frequently and would make payment on a later visit. The bill was never paid.

Sometime during the Spring of 1976, Inscore went to Schlemmer Farm Supply in Laddonia looking to purchase all the feed supplements in stock. When the owner refused to extend credit, Inscore said he would return and pay by check because he had forgotten his checkbook. He never returned.

On June 24, 1976, Inscore engaged in three separate transactions. The first ended with ten days credit on a purchase of two tons of cattlefeed and 50 pounds of minerals from Black Feed and Produce in Mexico, Missouri. The second involved ten days credit for 500 pounds of ASP–250 worth $675 at a farm supply company in Hawk Point. The third found Inscore receiving ten days credit on the $360.99 purchase of all the Tylan in stock at a Bowling Green, Missouri feed store. In each instance, he promised future payment, signed the bill, and took the goods. In no instance did he ever pay the bill.

On July 26, 1976, Inscore agreed to purchase 50 pounds of ASP–250 and 100 pounds of CSP–50 from the MFA Exchange in Freeburg. Granted credit by the manager, Inscore signed the bill for $232.06 and departed with the goods. Two weeks later he came back for more but was refused credit. The first bill was never paid.

On September 2, 1976, Inscore purchased 100 pounds of ASP–250 and 100 pounds of Tylan–10 from Veuleman's Elevator at Sedalia, Missouri. He took the goods on ten days credit and never paid for them.

On September 20, 1976, Inscore attempted to purchase 300–400 pounds of Furox–50 from the MFA Exchange at Boonville. The manager told him he would have to check to see if FDA regulations allowed such a sale. He also gave Inscore a credit application to fill out before he would approve the purchase. When the manager returned from a phone call, Inscore was gone.

On September 30, 1976, Inscore asked to purchase 50 pounds of Tylan–10 from the Monroe County Service Company in Paris, Missouri. He told the salesman he had forgotten his checkbook and asked if he could send a check. Credit was extended and the bill was never paid.

Sometime in September, 1976, Inscore approached the manager of the MFA Exchange in New Florence, Missouri for a credit purchase of seed. When the manager said he required approval from his main office for a credit purchase, Inscore left and never returned.

The transactions similar to the one for which defendant was tried and convicted involved many hundreds of pounds of livestock feed additives. These additives are added in small proportion to livestock feed. Based upon the quantity purchased within one year's time and the small proportion in which they are added to feed, for Inscore to have used the products himself would have required a huge herd of animals. The evidence showed that he owned no livestock at all.

■ The record contains sufficient evidence to support defendant's intent to defraud the Vandalia Feed Store at the time of his purchase and also supports, therefore, his guilt of the perpetration of a confidence scheme in violation of § 561.450 RSMo.

■ Appellant charges that the prosecutor impermissibly commented on defendant's right to silence by the following:

"He said there is no evidence the Defendant is not going to pay. Well, there is no evidence at all. We have got no evidence. The Defendant is in debt. We don't know how much money he has. I will tell you this. Carl Sapp, the Defendant's attorney, is a good attorney; he is an excellent attorney; he is one of the best. He was trying cases probably before I was born and if there had been any evidence he could have produced as any defense in this case you had better believe he would have produced it."

The question is whether this argument violated defendant's rights under the Fifth Amendment to the Constitution of the United States and practically identical Art. I § 19 of the Missouri Constitution that no person ". . . shall be compelled in any criminal case to be a witness against himself . . ."; or if the questioned comments violated § 546.270, RSMo 1969 and the corresponding identical provision of Rule 26.08:

> If the accused shall not avail himself or herself of his or her right to testify, or of the testimony of the wife or husband, on the trial in the case, it shall not be construed to affect the innocence or guilt of the accused, nor shall the same raise any presumption of guilt, nor be referred to by any attorney in the case, nor be considered by the court or jury before whom the trial takes place.

*State v. Hutchinson,* 458 S.W.2d 553 (Mo. banc 1970), held that only direct and certain references to the failure of the accused to testify were proscribed and allowed a prosecutor's comments that defendant could have called "any witnesses he wanted to," that he was "free to offer any evidence he had," and that defendant had offered no evidence.

Examination of the comment in the instant case results in the same conclusion. In the first place, it was not a reference to the accused's failure to testify as prohibited by § 546.270 and Rule 26.08, but to counsel's failure to put on evidence. Second, it was an assertion that no evidence had been offered by the defense, a statement upheld in *State v. Hutchinson,* supra, thus rebutting appellant's constitutional challenge.

■ Appellant charges error in the trial court's exclusion of his wife's testimony as a sanction for noncompliance with Rule 25.-34 in failing to disclose her as a defense witness. The rule provides:

> . . . the defendant shall disclose to counsel for the state such part or all of the following material or information within his possession or control designated in such request:
>
> \* \* \* \* \* \*
>
> (2) The names and last known addresses of persons, other than defendant, who defendant intends to call as witnesses at any hearing or at the trial, . . .

Appellant concedes that the State made written request for disclosure of his witnesses and that his wife's name was not disclosed. He argues he was not required to disclose his wife as a possible witness as she could have asserted marital privilege and could not have been compelled to testify.

Rule 25.34 excludes only the defendant from its mandate. Sanctions permitted at the discretion of the trial court for failure to comply include the exclusion of evidence. Rule 25.45. It was thus not an abuse of discretion. *State v. Ellis,* 567 S.W.2d 454 (Mo.App.1978).

Judgment affirmed.

DONNELLY, RENDLEN and MORGAN, JJ., and HENLEY, Senior Judge, concur.

BARDGETT, C. J., dissents in separate dissenting opinion filed.

SEILER, J., dissents and concurs in separate dissenting opinion of BARDGETT, C. J.

WELLIVER, J., not sitting.

BARDGETT, Chief Justice, dissenting.

I respectfully dissent. In my opinion the evidence was insufficient to support a con-

viction of perpetrating a confidence game in violation of § 561.450, RSMo 1969, and on that basis the judgment of conviction should be reversed and the defendant discharged. Also in my opinion the court erred in refusing to permit the wife of the defendant to testify in the defense of this case.

As pointed out in the principal opinion, the elements of the crime charged under § 561.450 are (1) defendant obtained goods from another person; (2) by means of false or fraudulent representation; (3) with the intent to cheat and defraud.

It is undisputed that the defendant obtained goods from the feed store of Mr. Donald Elsberry in Vandalia, Missouri, on January 27, 1976; that after the goods, which consisted of animal health supplies, were loaded on the truck, the defendant asked Mr. Elsberry if he could have thirty-days credit, to which Elsberry replied, "Yes, if you will sign the ticket." Defendant signed the ticket. Elsberry thought the defendant would pay him in thirty days or he would not have sold him the goods. As of trial time, Elsberry had not received payment on the invoice. After the first thirty days were up, Mr. Elsberry still waited a couple of weeks before he sent the defendant a statement. The only thing Mr. Elsberry did to collect the bill was to call him once. It was an ordinary sales procedure for the customer to sign a ticket for the commodities that were purchased, and Mr. Elsberry expected payment within thirty days. Mr. Elsberry testified that he had a store policy of giving people credit, and in the context of the testimony it would seem that the policy was to give credit for thirty days. The foregoing represents all of the evidence in the case with reference to this transaction. Additionally, and as noted in the principal opinion, the state presented evidence of a number of other [1] transactions where the state's witnesses testified that

defendant purchased products from them on credit and failed to pay. In each instance defendant left his correct name and address with the merchant from whom he purchased products on credit. The state's evidence showed that on several occasions when defendant attempted to purchase merchandise but was not immediately afforded credit, he left without making any purchase.

It is my view that the evidence pertaining to the transaction which is the subject matter of this prosecution reflects an event that takes place in numerous stores throughout this state. The product may be different and the amount of purchase may vary, but signing a sales slip which simply acknowledges receipt of the goods is done in ordinary, everyday transactions whenever a customer does not pay for the goods at the time of purchase. The slip signed by defendant in this case is not shown to be any different from that which innumerable purchasers sign daily when purchasing goods on credit. In other words, the signing of such a receipt is not evidence of any obligation to pay or the undertaking of any obligation other than that which is clearly implicit in the sale on credit itself. The entire transaction presumes and assumes that the customer will pay for the goods. That obligation is inherent in the sale, and signing a sales ticket is not represented to impose any different or additional undertaking by the customer. It is certainly common knowledge that on numerous occasions the person who received the goods on credit does not pay the bill and is sued for the purchase price. In a criminal case such as this the question might arise as to when the crime occurred. Was it at the end of thirty days when the bill was not paid, or was it at the time defendant left the store with the merchandise on his truck, or was it sometime in between?

However, the initial question that is posed in this case is whether or not the

---

1. The other transactions include credit purchases both prior to and subsequent to January 27, 1976, the date of the offense which is the subject of this appeal. These credit sales are referred to elsewhere as "other" instances, transactions, or credit purchases.

defendant made a "false and fraudulent representation" to the merchant. There is no evidence that he made any representation to the merchant of any existing fact. For that matter, there is no evidence that he affirmatively said to the merchant, "I will pay you in thirty days." As a result, it comes down to the question of whether or not merely requesting thirty-days credit followed by failure to pay is sufficient evidence from which a jury can find that the request for thirty-days credit constituted a false and fraudulent representation. It is difficult to construe a request for credit to be a representation of any existing fact. In my opinion, the evidence in this case demonstrates that there was no representation made. What did happen, of course, was that the purchase of the goods themselves carried with it an implied obligation to pay for them. Signing a ticket acknowledging receipt of the goods however added nothing to that obligation. It only constituted written evidence that the customer received the goods and is therefore required to pay for them.

*State v. Basham*, 568 S.W.2d 518 (Mo. banc 1978), also involved the charge of perpetrating a confidence game in violation of the same provision, § 561.450, *supra.* In that case the defendant agreed to paint certain barns and the owner of the property gave him a check for $400 to buy paint. The defendant did not paint the barns and was charged with obtaining the money in violation of § 561.450. This Court reversed the conviction and held the evidence was not sufficient to support it. In *Basham* it was said that the intent to cheat and defraud may be shown by circumstances from which such intent may be inferred. However, before a jury is permitted to find a verdict of guilty where fraudulent intent is an element of the crime, there must be found in connection with the act done attending circumstances which bespeak fraud—a situation where common experience finds a reliable correlation between the act and the corresponding intent. If such a relation is absent, or if the circum-

stances proved are consistent with innocence or raise only a suspicion or probability of guilt, the conviction cannot be allowed to stand. *Basham* at 520.

In the instant case I believe it would be virtually impossible to say that the circumstances and the evidence attending the particular sale were not consistent with innocence, inasmuch as there were no representations made and nothing occurred that does not occur in the course of a normal sale on credit. Were the evidence in this case limited to that which transpired at Elsberry's store, then, *a fortiori*, the state would have wholly failed to make a submissible case, because that evidence would not have raised even a suspicion or probability of guilt. The evidence of other transactions which, according to the state, also constituted crimes but for which the defendant has not been found guilty, at most would raise in one's mind a suspicion of guilt. The testimony with respect to the transactions during the other credit sales and those instances where the defendant did not go through with the purchase does not demonstrate that on each of those occurrences a crime was committed. If the testimony is true as given by the state's witnesses, then what it does demonstrate is that other merchants extended credit to the defendant and he did not pay their bills. As I understand it, probative value in each of those other transactions would exist only if the jury found that in each of those instances this defendant intended not to pay the bill at the time he acquired the purchases and did, in fact, commit a crime in each of those instances. It would seem that, assuming the admissibility of such evidence, which I consider doubtful, before a jury could use those transactions for the purpose of determining that the sale involved in this case was prompted by a false and fraudulent representation, the jury would first have to determine that in each of the other instances the defendant had committed a *crime.* If the other instances were simply nonpayment of credit purchases, there would be no probative criminal case value. What this

demonstrates is that there must remain in the law a recognizable difference between "legal relevancy" and "logical relevancy". The difference between these two concepts is well known to the law and is the basis upon which many decisions are made in connection with the admission or refusal of evidence. As applied to this case, it may very well be that an ordinary person would conclude that the failure of the defendant to pay his past bills made him a thief of sorts and would be sufficient upon which a person might form an opinion that he never intended to pay the bill, although the defendant may not have committed any crime in connection with the past bills and simply did not pay them. Because the other events taken individually or cumulatively do not demonstrate any criminal conduct, those events ought not to provide the basis for legal relevancy so as to warrant a jury in using them to find a present criminal intent.

What then do we make of the fact that in the instant case the defendant was charged in three counts, which charges consisted of completely separate transactions with the common denominator being that he purchased property on credit and did not pay for it. Nevertheless, the trial court sustained defendant's motion for a directed verdict as to two of the three counts. The testimony as to the two upon which the motions for a directed verdict were sustained for failure to make a submissible case was virtually the same type of testimony that was introduced with respect to the other transactions. Was the jury permitted to consider the testimony with reference to the credit sales of the two counts which were dismissed in connection with the decision as to whether or not the defendant was guilty of the count that was submitted?

The essential reason this judgment should not be affirmed is that it permits the conviction of a person for a criminal offense based upon pure speculation and conjecture by the jury as to criminal intent. The jury is allowed to find criminal intent simply on the objective evidence of failure to pay a bill. What triggered the filing of this criminal action was the defendant's failure to pay the bill thirty days later. I am very much concerned that this case puts in place decisional law in the state of Missouri which authorizes a judge or a jury to convict of the crime of perpetrating a confidence game and authorizes the imprisonment of a defendant on evidence that does nothing more than support a finding that the defendant was a bad credit risk—that he failed to pay his bills. Imprisonment for debt is constitutionally prohibited by art. 1, § 11, Constitution of Missouri, and by Amendment Thirteen of the United States Constitution.

In civil cases, where the intent not to perform is an element of the cause of action, that element is not satisfied merely by evidence of failure to perform. *Klecker v. Sutton*, 523 S.W.2d 558, 562 (Mo.App.1975); *Brennaman v. Andes & Roberts Bros. Const. Co.*, 506 S.W.2d 462, 465 (Mo.App. 1973). And, as stated in Restatement (2d) of Torts § 530, Comment d (1977):

. . . The intention of the promissor not to perform an enforceable or unenforceable agreement cannot be established solely by proof of its nonperformance, nor does his failure to perform the agreement throw upon him the burden of showing that his nonperformance was due to reasons which operated after the agreement was entered into. The intention may be shown by any other evidence that sufficiently indicates its existence, as for example, the certainty that he would not be in funds to carry out his promise.

If, as the civil cases hold, failure of performance is insufficient to establish fraudulent intent or to shift the burden of proof of explaining nonperformance, it should be reasonably expected that this would be the minimum rule of law in criminal cases where the burden of proof is on the state throughout the trial and never shifts to the defendant, and where the state must prove each element of its case beyond a reasonable doubt.

If this be the rule as to one instance of nonperformance, it is of necessity the rule with respect to each and every contract or agreement where the defendant failed to perform. Otherwise, a criminal intent essential to the conviction may be built upon a series of evidentiary facts which in and of themselves are insufficient to prove a criminal intent in each component transaction. It allows inference to be built upon inference, and that is prohibited.

No one in this case argues that any one of the events, in and of itself, was sufficient to justify a finding by a judge or jury that this defendant was guilty of a crime or crimes. It is, in my opinion, wholly improper to allow the use of individual transactions each of which, in and of themselves, together with the attending circumstances surrounding the given transaction, would not suffice to convict a person of a crime.

The criminal law and the threat of criminal prosecution were not intended to be used to collect civil debts or to coerce a person to perform a civil obligation under threat of criminal prosecution. It is my opinion that the effect of the principal opinion in this case will be to encourage merchants to threaten delinquent customers with criminal prosecution for operating a confidence game unless they promptly pay their debts. This has the consequential effect of making the prosecuting attorney a bill collector for the merchants. I say this because there is no overt act that could be considered criminal in nature that forms part of the underlying evidence in this case. The intent to cheat and defraud is an inference which the principal opinion permits to be drawn from otherwise innocent (from a criminal standpoint) acts and from the mere purchase of goods on credit and the failure to pay. In short, a "non-representation" has been converted into a "representation" by inference, and the civil duty to pay for goods purchased, the failure of which subjects a person to civil liability, is used as the event which gives rise to the criminal prosecution.

This was certainly an unfortunate experience for the merchant involved in the case which resulted in the conviction, as well as the merchants involved in the two counts where a directed verdict was entered up for the defendant in this prosecution. Likewise, it is an unfortunate experience for the other merchants involved in the other transactions that appeared in evidence in this case. "Unfortunate" may be a mild word to describe the merchants' feelings in this matter. However, in each instance, it must be recognized that the merchant simply extended credit to a person he did not even know, and in that respect, at least so far as the criminal law is concerned, took his own chances with the customer. It should be borne in mind that there was no "device", such as a credit card or a check, or any other objective item which constitutes a *present* misrepresentation of an existing fact, like the present validity of the check or the credit card. In this case there was, at most, an implied or express obligation to pay the bill in thirty days. But that obligation was nothing more than the civil obligation undertaken when purchasing goods on credit.

The evidence adduced in this case consisted of nothing more than a promise to pay for the goods thirty days after their receipt and the failure to pay. If the statute under which the defendant was convicted is applied by the courts so as to allow for a prima facie case of criminal violation to occur on such evidence, then, in my opinion, our statute falls under the same condemnation as did the Florida statute in the case of *Pollock v. Williams*, 322 U.S. 4, 64 S.Ct. 792, 88 L.Ed. 1095 (1944). In that case the statute provided that a prima facie case of obtaining property by fraudulent promise was made upon a showing of the failure to perform without just cause. The United States Supreme Court declared such a statute unconstitutional as in violation of the Thirteenth Amendment to the United States Constitution. See also *Taylor v. Georgia*, 315 U.S. 25, 62 S.Ct. 415, 86 L.Ed. 615 (1942), and *Bailey v. Alabama*, 219 U.S.

219, 31 S.Ct. 145, 55 L.Ed. 191 (1911). Although it would be correct to say that our statute does not speak to a prima facie case of violation being made upon the showing of failure to perform, yet the construction placed on the statute by the principal opinion in this case has the effect, from a practical standpoint, of expanding the statute so as to judicially apply that type of evidentiary rule to the instant crime.

A bare reading of the actual testimony given in this case leads me to the firm belief that, under this decision, a prosecutor may use one or more other instances where a customer purchases goods on credit and fails to pay for them in order to obtain a conviction in a prosecution involving precisely the same facts. He would simply use the failure to pay the other debts as the evidentiary basis upon which either a judge or a jury could infer and find criminal intent. This is entirely too illusory a standard upon which to premise a conviction of a crime. In my opinion, it is not warranted by the statute and is contrary to the proscription against imprisonment for debt found in the Missouri Constitution and in the United States Constitution.

For the above reasons I believe the conviction in this case should be reversed outright and the defendant discharged.

The last point addressed in the principal opinion is the error charged by defendant in the trial court's exclusion of his wife's testimony as a sanction for noncompliance with our Rule 25.34. Defendant's wife was offered by defendant as a witness in the defense of this case. Upon objection by the state, the court refused to permit the woman to testify because the defendant had not notified the state that he would call his wife as a witness in the case, as literally required by our Rule 25.34.

The record in this case reflects that at the outset of the trial defense counsel asked the court to invoke the exclusion rule as far as witnesses were concerned. The court granted this request and announced that anyone in the courtroom who had either been subpoenaed as a witness or who had been informed that they will testify should leave the courtroom. Defense counsel then said in open court, "Mrs. Alma Inscore is the wife of the defendant in this case. I may or may not use her as a witness. Does your order apply to the wife of the defendant also?" To which the court replied, "Yes. I think it should." The prosecutor was in court and heard this statement. There was no objection by the prosecutor at that time to the possibility of calling defendant's wife as a witness. At the conclusion of the state's evidence in the case, defense counsel advised that he was going to call defendant's wife as a witness. The prosecutor objected on the grounds the defendant failed to furnish this name in accordance with the Supreme Court rule referred to supra. The court sustained the objection. By that time it was late in the day, and the jury was in recess. After calling the jury back, the court announced that the state had formally rested its case and excused the jury until the next day. Just after the jury had left, defense counsel stated, "Let the record show I am offering to allow Cindy MacPherson [prosecutor] [to] discuss and talk with and anything that she wishes to do with Mrs. Inscore tonight so that I might reoffer her tomorrow if I have prevented her from her right of discovery." The prosecutor's response was simply that the motion had already been ruled on.

In my opinion the court erred in invoking the sanction of precluding the defense from calling the defendant's wife as a witness in this case. Our rule has for its purpose the elimination of as much surprise as possible in the trial of cases, and I think one of the purposes of the rule is to afford the prosecution the opportunity to depose the witnesses whom the defendant declares will be testifying in the case, or at least to obtain their statements. In other words, it affords the prosecution the opportunity to conduct an investigation. None of those reasons apply when the witness is the wife of the defendant. She has, under Missouri law, the right not to testify and her failure to do

so cannot be used against the defendant or referred to during the trial. She has in fact the same rights with respect to testifying as does the defendant. The prosecution cannot take her deposition and she may, with impunity, refuse to give any statement or deposition. In these circumstances the purpose of the rule with respect to investigation simply cannot be satisfied when the witness is the defendant's wife. Therefore, in my opinion, there is no good purpose served by invoking the sanction of excluding as a witness the defendant's wife, even though unlike the defendant she comes under the literal provisions of the rule.

However, even if the court holds that the rule applies with respect to the wife, the record reflects that the prosecution was advised at the outset of this case of a possibility of calling the defendant's wife as a witness. We ought not to be naive about this matter. All defense counsel had to do just before the case began was to say that he was going to call the wife as a witness. This did not obligate him to call the wife as a witness and under the statutes and laws the prosecution could have made no comment about it and could not have prevented her from testifying. It was clear from the outset of this trial that there was a very real possibility that the defendant would call his wife as a witness. The prosecuting attorney took no action at all with respect to the matter at the time she was advised that defendant's wife might be a witness. Subsequently, when offered the opportunity of interviewing defendant's wife, a right which the prosecutor could not enforce in her own right, the prosecutor declined the invitation. At that point, the reason, if there be any, for continuing to invoke the sanction of excluding the defendant's wife as a witness had completely evaporated.

I acknowledge that the literal reading of this rule places the spouse of a defendant in the same category as other witnesses. Sometimes rules are written in language that is perhaps too broad. They ought not to be applied in a wooden fashion and with-

out reason. Whether to apply this sanction was a matter of discretion with the trial court, and in my opinion the trial court abused its discretion by invoking the sanction of excluding the spouse as a witness in this case to the prejudice of the defendant. Therefore, for this reason alone, the judgment should be reversed and the cause at least remanded for a new trial on the basis of this error.

For the foregoing reasons, I dissent.