**STATE of Missouri,
Plaintiff-Respondent,**

v.

**Sidney G. PORTER,
Defendant-Appellant.**

**No. WD 32248.**

Missouri Court of Appeals,
Western District.

Feb. 2, 1982.

Motion for Rehearing and/or Transfer to
Supreme Court Overruled and Denied
March 9, 1982.

Everett S. Van Matre, Mexico, for defendant-appellant.

John Ashcroft, Atty. Gen., and Robert L. Presson, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

Before KENNEDY, P. J., and SHANGLER and WASSERSTROM, JJ.

KENNEDY, Presiding Judge.

Sidney G. Porter was convicted upon a jury trial of "obtaining property by means of a confidence game" in violation of § 561.450, RSMo 1969 (repealed January 1, 1979). In accordance with the jury's verdict, he was sentenced to six months' imprisonment in the county jail and a fine of $1,000.

Property alleged to have been fraudulently obtained were six calves delivered by one Ray Banning on August 11, 1976, to Macon Beef Packers, and not paid for. Defendant was treasurer and chief financial officer of Macon Beef Packers. Beef Packers closed its doors the morning of August 13, 1976, and never reopened. Ultimately it went into bankruptcy.

Defendant was charged with eight other counts of fraud, based upon eight other sales of cattle to Beef Packers. On those eight counts, all tried with the Banning count, he was acquitted by the jury.

Defendant challenges the sufficiency of the evidence to support the conviction. In particular, he claims there is no proof of any intent on his part to cheat and defraud Mr. Banning at the time the cattle were received. On this point defendant is correct. In failing to prove the defendant had any "intent to cheat and defraud" in receiving Mr. Banning's calves, the state has failed to make out a case under the cited statutory section. The judgment of conviction must be reversed.

The facts disclosed by the evidence are as follows:

Macon Beef Packers was a corporation engaged in the beef packing business at Macon. The extent of defendant's stock ownership in the corporation is not entirely clear. It may have been 15 percent or it may have been 25 percent. The principal stockholder was defendant's brother, Terence Porter, who was also president of the company. Terence Porter was not at the plant on a daily basis, however, and the executive duties were shared by defendant and Duane Snyder, who was plant manager.

Beef Packers, as we shall hereafter call the business, would buy live cattle, slaughter them and sell the meat and by-products. The live cattle were purchased from individual cattlemen by negotiated sales and also at cattle auctions. Some cattle were also bought on a grade and weight basis, so that the seller would not know what he was being paid for his cattle until after they were butchered and the meat graded and weighed. The cattle purchases during the period in question were made mostly by Rick Thornburg, an employee of Beef Packers, who would buy cattle at auction sales and would also negotiate purchases from cattlemen in the field.

In the case of the cattle purchase of which defendant was convicted, a cattleman by the name of Ray Banning on August 11, 1976, without solicitation, delivered six calves to the plant to sell on a "grade and weight" basis. He received a weight ticket showing their live weight. He did not receive payment at the time. In accordance with an earlier arrangement with Beef Packers, and in accordance with earlier practice (he had sold cattle to Beef Packers for two or three years, once or twice a year), he expected to receive a check in about a week. He later received from Beef Packers a proof of purchase statement showing the value of the six animals to be $2,122 and some cents, but he never received payment. The plant closed August 13, 1976, and never reopened.

To make out a case under § 561.-450, RSMo 1969 (repealed January 1, 1979), where the state relies upon a false representation which allegedly induced the victim to part with his property, the representation must be of a past or present fact. *State v. Houchins*, 46 S.W.2d 891, 894 (Mo.1932); *State v. Phillips*, 430 S.W.2d 635, 637[2] (Mo.App.1968). It is not enough, as everybody understands, to show that the defendant bought goods on credit, promising to pay for them, and then failed to pay as agreed. That is only a breach of contract, for which there are civil remedies, but for which the buyer may not be criminally prosecuted. To imprison a person for debt is prohibited by our Constitution. Mo.Const. Art. 1, § 11; *see Kansas City v. Pengilley*, 269 Mo. 59, 189 S.W. 380, 381 (1916).

On the face of it, that seems to be the case with the purchase of Mr. Banning's cattle—a purchase on credit, and a failure on the part of the seller to pay as agreed.

The state, however, points to cases where the defendant has purchased goods on credit, impliedly or expressly promising to pay, but secretly having an intention not to pay for them. His promise to pay is only a ruse to obtain possession. It is a knowing misrepresentation of a present intention, hence of an existing fact. Such a case is *State v. Inscore*, 592 S.W.2d 809 (Mo. banc 1980), upon which the state relies. There the defendant went from store to store and purchased animal health products in large quantities on credit. It was shown that he had no animals to use the products he was purchasing. He never paid for any of them. Our Supreme Court held that the evidence made a submissible case of fraud on the part of the purchaser, saying:

In particular, to prove intent to defraud based upon a promise, the State may introduce evidence of similar incidents whereby the defendant obtained money from other victims by making some sort of promise. The theory which underlies admission of such evidence is that if a defendant *consistently makes the same promise* to a number of victims and, after obtaining the victim's money or goods, *consistently fails to perform*, it may be fairly inferred from the pattern

of behavior that no mischance could reasonably explain all the failures of performance. Thus, the inference is raised that the defendant must have intended not to perform in any instance and particularly in the situation in which he has been charged. *State v. Basham*, 571 S.W.2d 130 (Mo.App.1978). Evidence at trial of the numerous similar transactions whereby appellant obtained feed products upon a promise to pay later then failed to do so was sufficient to establish the inference of intent to defraud in the Vandalia feed store transaction. (Emphasis supplied.) Id. at 811.

The case now before us is far different from the *Inscore* case, as the following facts will show: Beef Packers had been in business in Macon since 1969. It had been acquired at that time from MFA by defendant's brother and a Mr. Cleaveland. (By the time we are considering, Mr. Cleaveland was no longer in the picture.) Defendant became office manager and chief financial officer of the business.

Those selling cattle to Beef Packers would sign an agreement to wait for their money for a week or two weeks. Without such written agreement, United States Department of Agriculture regulations require payment within 72 hours of delivery. Mr. Banning had signed such an agreement, agreeing to seven days' credit. Beginning in 1975 and continuing up to the time of closing the plant on August 13, 1976, the plant was buying and slaughtering 800 head of cattle per week. It employed 32 people.

The plant had been plagued with cash-flow problems from the beginning, but it began to take on critical proportions in the spring of 1976. In late spring or early summer, according to the testimony of Mr. Snyder, manager of the plant, they began to have difficulties in buying cattle at a price which would yield a profit. On specific instructions from Terry Porter, defendant's brother and the president and principal stockholder of Beef Packers, Snyder continued to buy cattle "and in sufficient numbers to operate the plant and keep the cash flow going". Snyder explained that "we could buy cattle that we knew were going to lose us money, but that in turn lost us less money than not operating at all".

As the cash flow went into a negative status, defendant—or sometimes Mr. Snyder, or defendant's secretary—would call their bank daily, to see how many checks had come in for payment. This commenced in mid-May, 1976. On some days, the bank balance would be insufficient to pay the checks. Then stop-payment orders would be issued for some of the checks. Stop-payment orders were issued on checks which would otherwise be returned unpaid because of insufficient funds, with the oldest checks being given priority over the more recent ones. From mid-May, when the stop-payment practice began, to August 13, when the plant closed, there were stop-payment orders on 144 different checks. The evidence nowhere tells us how many checks were routinely paid as presented to the bank with no stop-payment order, but from the volume of business it is easy to infer that there were many more that were routinely paid in the three-month period than the 144 that were stopped payment. For that matter, of the 144 there were 61 on which the stop-payment orders were withdrawn on the same day or the next day. The checks on which stop-payment orders were rescinded, if they had not already left the bank, were paid promptly. In those instances the payee of the check would know nothing of the stop payment. In the case of others of the withdrawn stop-payment orders, the checks had already left the bank and would have to be re-presented by the holder. Where a stop-payment order was given to the bank, and not withdrawn, a duplicate check would be issued by Beef Packers to the holder.

The monies coming into Beef Packers' bank account came principally, it appears, from Walter Heller & Company of Chicago, which was financing Beef Packers' accounts receivable. There appears to have been a daily reporting by Beef Packers to Heller of its receivables. Heller would then deposit to Beef Packers' account—by means of a wired bank-to-bank transfer—an amount

equal to 70 percent of the receivables. It had earlier been 80 percent of the amount of the receivables, but sometime in 1976 the percentage was reduced to 70 percent. Heller was advancing something like $80,000 per day on accounts receivable. These represented 90 to 95 percent of the receivables. Some accounts receivable were withheld by Beef Packers because Heller did not want them because of their small amount or because of some other ineligibility. A few accounts were withheld by Beef Packers because the customers habitually paid promptly and nothing was to be gained by factoring the accounts. Presumably there were also deposits to the bank account from cash sales, from payment of unpledged accounts receivable, and from amounts by which accounts exceeded the amount borrowed, which added some amount to the bank balance.

On August 11 or 12, the bank president notified Beef Packers that the bank could not continue with the volume of stop-payment orders and asked that the account be closed. The plant did not open for business on the morning of the 13th. While the stop-payment orders dated August 11 and earlier generally contained the notation that a duplicate check would be issued, the August 12 stop-payment orders stated that a duplicate check would not be issued.

■ In the foregoing evidence there is no evidence at all that the defendant entertained any "intent to cheat and defraud" Mr. Banning of his cattle on August 11, 1976. There was no intent on defendant's part not to pay for the cattle; all the evidence points instead to an intent to pay for them. Had the plant continued to operate as it had, and had the bank continued as it had for three months to cooperate in the stop-payment procedure, no one can say from the evidence that Mr. Banning would not have been paid routinely. In accord-

ance with the practice at the plant, his bill would have come up for payment seven days after the August 11 delivery of the cattle, and a check would have been written and placed in the mail. There is nothing in the evidence from which it could be inferred that it would not be paid. Still less can it be said that the defendant intended on August 11 that Banning not be paid.

Defendant's role in closing the plant is not shown anywhere in the evidence. There is certainly no evidence that he had the authority to keep the plant in operation or to close it. There is nothing in the evidence to show that on August 11, 1976, when Mr. Banning brought his cattle to the plant, that the defendant knew that the bank was going to stop its cooperation in the stop-payment system, or knew that the plant would be closed down on the 13th.

■ We have gone further than the state suggests to inquire if the defendant's recklessness in continuing to purchase cattle in the face of Beef Packers' financial situation can be considered the equivalent of an intent to cheat and defraud. Presumably, if a defendant promises to pay on a certain day and there is a certainty that the funds will not be available, a fraudulent intent might be inferred. *State v. Inscore,* supra. The evidence here does not make out such a case. There is no evidence here that the cash flow situation, viewed from defendant's standpoint on August 11, had no prospects of continuing at the same level or improving. There is no showing that there were no other sources from which cash might have been secured.[1]

The judgment of conviction is reversed and the defendant is ordered discharged.

All concur.

---

1. According to defendant's evidence, there was pending an application with the Farmers Home Administration for the guarantee of a $500,000 loan which had been committed by Citizens Savings Association at Mexico, Missouri. The application had been approved on the state level on June 30, 1976, and was awaiting ap-

proval from the United States Department of Agriculture in Washington, D.C. The consummation of this loan would have given a $290,-000 cash infusion to the business. The Washington approval for the loan came through August 23, 1976, 10 days after the closing of the plant.